IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CAROLYN SIMMONS,

                    Petitioner,

          vs.

D. K. JOHNSON, Warden,
Central California Women's Facility,

                    Respondent.

No. 2:14-cv-00413-JKS

MEMORANDUM DECISION

Carolyn Simmons, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Simmons is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at Central California

Women's Facility.  Respondent has answered, and Simmons has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On July 9, 2009, Simmons was charged with the 1991 first-degree murder of Richard

Jackson.  The information further alleged that the murder was committed during the commission

of a robbery.  Simmons pleaded not guilty and denied the special circumstance.  On direct appeal

of her conviction, the California Court of Appeal described the following events underlying the

charges against Simmons:

> On June 16, 1991, Jackson made plans to have Father's Day dinner with his close
> friend Addie Hayes.  Jackson lived alone in a small apartment on Clauss Court in South
> Sacramento, on the periphery of Oak Park.  Hayes lived a few blocks away.  Because
> Jackson was an alcoholic, Hayes was the payee for certain government benefits Jackson
> received and made sure his rent and utilities were paid.  Jackson called Hayes on a
> nightly basis to inform her that he had made it home safely.  Hayes also had a key to
> Jackson's apartment in case she needed to check on him.  That afternoon, Jackson called
> Hayes and told her that he might not come over for dinner and to save him a plate of food
> for the next day.  Hayes became worried when Jackson did not call to check in later that

night. The next morning, after a couple of unsuccessful attempts to reach him on the phone, Hayes went to Jackson's apartment and discovered his body on the couch.

. . . Jackson had been repeatedly hit in the head with a blunt object, "something like a hammer," and had "multiple deep lacerations of the right side of his head." His skull, cheekbones, and eye socket were fractured. Jackson also suffered blunt-force injuries to the right side of his neck. His carotid artery was "torn almost completely through," his jugular vein was "torn completely," and the right portion of his thyroid gland was "crushed and torn." Jackson did not have any defensive wounds on his body, suggesting that the first blow "could have been an incapacitating blow, a blow to the side of the head, possibly the one that caused the [skull] fracture."

Hayes yelled for the apartment manager, who called the police. When Detective Dick Woods arrived, he noted there were no signs of forced entry. Nor was any blood found outside of the apartment. On the couch in the living room, Jackson's body was naked from the waist down and covered with a blanket. A nylon Brillo pad was placed in his mouth. Blood covered Jackson's head and neck, staining his previously white shirt. A blood swipe was found on his left thigh and blood spatters were found on both legs beneath the blanket. The blanket itself appeared free of blood. Blood spatters were also found on three living room walls, the ceiling, and the coffee table. There was no sign of blood in either the kitchen or bathroom. Based on the location of the blood and the spatter patterns, Detective Woods concluded all of the blood came from Jackson and declined to have any of it tested.

The overall appearance of the apartment was clean and orderly. There were no signs of ransacking. Several items were on top of the coffee table, including an empty bottle of Seagram's Seven Crown whiskey, a jar of Vaseline, four prescription bottles made out in Jackson's name, and a cardboard Brillo pad wrapper that had been torn into two pieces. Jackson's pants were on the floor by the front door. Police searched the pants and found a lighter, pocketknife, and soiled linen. They did not find a wallet, money, driver's license, or car keys either in the pants or anywhere else in the apartment. The bedroom was also neat and clean, with the exception of the bed's mattress being off of the frame and pushed about a foot and a half toward the wall. A closet door in the hallway was partially open. Inside the closet was an assortment of tools. Police found nothing in or around the apartment they believed to be the murder weapon.

Jackson's car was also missing. It was found in Oak Park the next morning, illegally parked at the intersection of Martin Luther King Boulevard and 22nd Avenue. The driver's seat was positioned as close to the steering wheel as possible. Several cigarette butts were in the ashtray, some of which were marked with lipstick. There did not appear to be any blood in the vehicle.

Police processed both the apartment and vehicle for latent fingerprints and interviewed several people in connection with the crime. [Simmons] became a suspect after her fingerprint was found on the toilet seat in Jackson's apartment and was brought in for questioning. After additional fingerprints were matched to defendant, she was again questioned by police.[1] At the time, [Simmons] lived at her mother's house on Schreiner Street in South Sacramento. Police executed a search warrant at this location, but found nothing tying [Simmons] to the crime. [Simmons'] son was present during the

2

search.  The District Attorney determined there was insufficient evidence to prosecute [Simmons] for the murder.

> FN1.   The People conceded these statements were taken in violation of [Simmons'] rights under *Miranda v. Arizona* (1966) 384 U.S. 436, 479 [16 L.Ed.2d 694] and did not attempt to introduce them into evidence.

The case went cold for nearly 18 years.

On January 23, 2009, [Simmons' son Anthony] Tyree walked into the police station and told Detective Kyle Jasperson that his mother had confessed to committing a murder.  Tyree explained that on a Sunday morning the previous summer, [Simmons] told him that she wanted to go to church but was not able to do so.  Tyree suggested that she go to church with her neighbors, Dan Elliott and his wife.  [Simmons] then stated that she was not allowed to go to their church because she had previously told their pastor, who was also a police officer, that she was "involved in a homicide."

After some coaxing, [Simmons] confessed certain details of the crime to her son. Tyree explained that [Simmons], who was "a known prostitute," told him that she was hanging out in Oak Park when an "old dude" picked her up and offered her money to come over to his house.  [Simmons] agreed and accompanied the man to his house.  But when the man tried to postpone paying her the money he promised, [Simmons] became angry and "picked up some type of object."  The man "took a drink or turned his head," at which point [Simmons] "hit him in the head really hard."  [Simmons] "took every dime in his pocket and left," taking the murder weapon with her.  She then "went somewhere and changed her clothes."

[Simmons] also told her son that the crime occurred when they lived on Schreiner Street.  Tyree, who was 21 years old at the time, remembered the police searching the house and bringing his mother in for questioning.  He estimated the crime occurred between 1988 and 1990, stating the crime could not have happened after he was arrested in January 1991 and sent to prison.  Detective Jasperson did not find a cold case matching the description Tyree provided during the specified years.  Jasperson then checked Tyree's criminal record and discovered that he was actually arrested in January 1992. Expanding the search to include 1991, Jasperson found that the Jackson murder matched Tyree's description.

The next month, Detective Jasperson contacted the bishop of the church attended by the Elliotts between 2001 and 2004, Stephen Hinkson.  Hinkson, who was also a police officer, told Jasperson that a woman had come to the church "about eight years ago" and stated that she was "involved" in a murder.  When Jasperson showed Hinkson a picture of [Simmons] from 2001, he could not positively identify her as the same person, but stated that she was "the same race" and "about the right age."  At trial, Hinkson testified that while the woman did not go into details, she did state that "it was a male victim," that "the cause of death may have been a blunt force trauma," and that she felt "responsible" for the man's death.  Hinkson told the woman that she would have to reveal everything she knew about the murder to law enforcement before she could become a member of the church.

On March 3, 2009, Detective Jasperson tried to contact [Simmons] at her residence.  Tyree answered the door.  He told Jasperson that his mother was not home, but that she had also confessed the murder to Rebecca Person, a close friend of the family.  At Jasperson's request, Tyree went down to the police station and called Person on the phone.  During the phone call, which was recorded, Tyree asked Person whether [Simmons] had told her that "she killed somebody" and then changed the story and said that "she cleaned up the crime scene" after somebody else committed the crime.  Person responded: "Yeah, something like that. I don't know.  I don't know what to believe."

The next morning, Tyree called Detective Jasperson and said that his cousin, Alicia Joseph, might have information about the murder.  Jasperson then called Joseph on the phone and told her that he was investigating an old homicide that potentially involved [Simmons].  Joseph responded: "Well, I know that she confessed herself to me."  As Joseph explained, [Simmons] stated that she went to an "older" man's house, and when he "made her mad," she picked up an object and "hit him on top of his head, and she just kept hitting him."  [Simmons] told Joseph that after she killed the man, she "cleaned herself up, and she cleaned up as much as she could so she wouldn't get caught."  [Simmons] also told Joseph that she was questioned by police in connection with the murder.  Joseph believed [Simmons] confessed to her in order to "get it off her chest."

On March 5, 2009, Detective Jasperson provided Tyree with a police "bait car," which was equipped with a hidden video camera and audio recorder.  Tyree had previously agreed to use the car to pick up [Simmons] and engage her in conversation about the murder.  When Jasperson spoke to Tyree after he dropped [Simmons] off, Tyree stated that he asked his mother why she told Person about the murder.  [Simmons] responded that she "felt guilty about it."  For some reason, the car's equipment failed to record the conversation.

That night, Joseph called the police and reported that [Simmons] had assaulted her with a deadly weapon.  [Simmons] was arrested and taken to jail.  She was not under arrest for the murder.

On March 6, 2009, Detective Jasperson contacted Person at her home.  After a brief conversation in the kitchen, Person asked if they could talk somewhere else, and the interview was moved to the police station.  At the station, Person explained that an emotional [Simmons] called her one night at around 10:30 p.m. and said: "I just can't live with myself, things that I've done in my life."  Person tried to console [Simmons] by saying that God would forgive her for whatever she had done.  [Simmons] responded: "I killed somebody."  Person said that she did not want to discuss the matter over the phone and agreed to meet [Simmons] at the Bonfare Market on Broadway.

At the market, [Simmons] told Person that two male drug dealers killed a man in front of her and forced her to clean up the crime scene.  According to [Simmons], one of the drug dealers promised to give her "some dope" in exchange for helping him "get in contact" with the man.  She agreed.  Pursuant to the plan, when [Simmons] went to the man's house, the drug dealers showed up and [Simmons] opened the door for them.  The drug dealers killed the man in front of her and demanded that she clean up the crime scene.  When she refused, one of the drug dealers pointed a gun at her head and forced her to do so.  After [Simmons] used ammonia and bleach to clean up the crime scene[2], the

4

drug dealers told her "you better keep your mouth shut" and dropped her off a couple blocks from her mother's house.  [Simmons] also stated the fact that the drug dealers needed to "go through her" to get in touch with Jackson should have tipped her off that this "wasn't a good situation."

> FN2.   There was no evidence that any blood at the crime scene had been cleaned up with ammonia or bleach.

As Detective Jasperson drove Person home following the interview, she told him that she remembered the "street name" of one of the drug dealers [Simmons] claimed was responsible for the murder, "Little Ray."  The next two days, Person twice visited [Simmons] at the jail.  During the first visit, Person told [Simmons] that she had spoken to Jasperson about the murder and told him that two drug dealers had committed the crime.  [Simmons] responded: "You shouldn't have even told him that."  Person also told [Simmons] that she made up the name "Little Ray" because she felt pressured.  During the second visit, [Simmons] told Person that instead of two male drug dealers, two women were actually responsible for the murder.  After this visit, Person called Jasperson and told him that [Simmons] had "changed her story," and that "now there were two females who were supposedly responsible or involved in this homicide."  Person stated that this was the first time [Simmons] told her this version of the murder.

On April 8, 2009, Detective Jasperson went to Person's house to follow up on her conversations with [Simmons] at the jail.  By this point, [Simmons] had been released from jail and was at Person's house.  Jasperson spoke with Person alone in the driveway.  Person continued to assert that [Simmons] had told her that two male drug dealers committed the murder and that "Little Ray" was the name of one of the drug dealers.

After obtaining permission to enter the house, Detective Jasperson spoke to [Simmons] alone in one of the back rooms.  [Simmons] admitted to being at Jackson's apartment the day he was killed, but claimed "there were two females who came walking into the apartment as she was leaving."  [Simmons] denied that drug dealers were involved.  Jasperson then brought Person into the room and asked whether [Simmons] had told her that two drug dealers had committed the murder.  [Simmons] answered that she never said that to Person.  Person's only response was that "she did not want to be involved in this."  [Simmons] then repeatedly denied that drug dealers were involved in the murder.  She then revised her story about the two women who were purportedly involved, and said that they were not walking into the apartment, but were instead coming into the apartment complex as she left.  [Simmons] provided no names for these women.

. . . [A]side from [Simmons'] statements to Tyree, Joseph, Person, and Hinkson concerning the murder, she left several fingerprints both in Jackson's apartment and in his vehicle.  Two such prints were found on the Brillo pad wrapper on Jackson's coffee table.

*People v. Simmons*, No. C065601, 2012 WL 1715860, at *2-5 (Cal. Ct. App. May 16, 2012).

On February 10, 2010, Simmons proceeded to jury trial.  On the twenty-second day of trial, the jury found Simmons not guilty of first-degree murder, but guilty of the lesser-included offense of second-degree murder.  The trial court subsequently sentenced her to an indeterminate term of 15 years to life imprisonment.

Through counsel, Simmons appealed her conviction, arguing that: 1) reversal was required because Simmons' right to a speedy trial was violated; 2) the trial court gave the jury an improper charge on the natural and probable consequences doctrine; 3) the trial court violated Simmons' rights to due process and a fair trial in its response to a jury question; 4) the trial court misinstructed the jury on voluntary intoxication; 5) the trial court violated Simmons' rights to due process, a fair trial, and to present a defense when it refused the defense request to re-open closing arguments; 6) the court reporter erroneously read certain testimony to the deliberating jury; 7) the court erroneously admitted evidence of Simmons' other bad acts; 8) the cumulative effect of the trial errors warranted reversal; and 9) the appellate court should strike the jail booking and classification fees due to insufficient evidence of Simmons' ability to pay.  On May 16, 2012, the California Court of Appeal issued an unpublished, reasoned opinion rejecting all the claims and affirming Simmons' judgment in its entirety.  *Simmons*, 2012 WL 1715860, at *1. Counsel for Simmons petitioned the California Supreme Court for review, which was summarily denied on August 15, 2012.

Simmons then filed a *pro se* petition for a writ of habeas corpus in the California Supreme Court.  She argued that: 1) she was denied her right to an impartial jury due to a juror's racial bias; 2) her appellate counsel was ineffective for failing to raise a number of meritorious claims on direct appeal; 3) the trial court made a number of reversible errors; 4) the 18-year

delay between the 1991 murder and her subsequent prosecution prejudiced her and damaged her ability to mount a defense; 5) the cumulative effect of the errors warranted reversal; and 6) the prosecution committed misconduct by presenting false evidence and perjured testimony. The petition was denied without comment on January 1, 2014.

Simmons timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on January 31, 2014.

## II. GROUNDS/CLAIMS

In her *pro se* Petition before this Court, Simmons raises six grounds for relief: 1) juror bias; 2) ineffective assistance of appellate counsel; 3) multiple trial court errors; 4) speedy trial violation; 5) cumulative error; and 6) prosecutorial misconduct.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision." *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Here, the only decision on Simmons' collateral review claims was a summary denial by the California Supreme Court on habeas review, which is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are

presumed to be correct unless the petitioner rebuts this presumption by clear and convincing

evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Ground One:          Juror Bias

Simmons first argues that her conviction should be reversed because one of the jurors

was racially biased against her.  Simmons raised this claim in her state habeas petition to the

California Supreme Court, and presented in support of her claim an email written by a family

member of a sitting juror.  The email stated that the sitting juror was motivated by racial animus,

felt negatively toward African Americans, and not only would vote for a guilty verdict regardless

of evidence but would encourage the other jurors to do the same.  The supreme court summarily

denied the claim.

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel

of impartial, 'indifferent' jurors."  *Irwin v. Dowd*, 366 U.S. 717, 722 (1961); *see Dyer v.

Calderon*, 151 F.3d 970, 973 (9th Cir.1998).  "Although doubts regarding bias must be resolved

against the juror, the defendants bear the burden of showing that the prospective juror was

actually biased, and that the [trial] court abused its discretion or committed manifest error when

it failed to excuse her for cause."  *United States v. Maloney*, 699 F.3d 1130, 1135 (9th Cir. 2012)

(internal citations, brackets, ellipses, and quotation marks omitted).  "If only one juror is unduly

biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth

Amendment right to an impartial panel."  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th

Cir. 1997).

The United States Supreme Court has "long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982); *Remmer v. United States*, 347 U.S. 227, 228-29 (1954) (remanding case to district court to "hold a hearing to determine whether the incident complained of was harmful to the petitioner"). The record here reveals that the sitting juror was informally questioned at the courthouse by the prosecutor and defense counsel, and the juror denied having any animus or allowing any animus to affect him during deliberations.

While it may concern the Court that the parties' inquiry and questioning of the sitting juror was conducted informally and outside the presence of the trial judge, that fact does not compel the conclusion that an adequate inquiry was not made. The United States Supreme Court does not require the partiality hearing to be conducted in a specific manner. *Smith*, 455 U.S. at 217-18. The Ninth Circuit has applied the *Smith* hearing requirement to a variety of situations and concluded that "[a]s long the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness." *Hedlund v. Ryan*, 750 F.3d 793, 807 (9th Cir. 2014) (citing *Dyer*, 151 F.3d at 974-75).

Here, the record indicates that, after the court received the email, it sent copies of the letter to both the prosecutor and defense counsel. Although the author asked to remain anonymous, it was agreed that both counsel could contact her for further information. The court also sent a letter asking the sitting juror to appear in court on April 30, 2010. Investigators for both the prosecution and the defense emailed the author and indicated that they needed to speak with her as soon as possible. The author did not respond. She did, however, briefly respond to

an email sent by defense counsel and stated that it was all "a misunderstanding." Defense counsel again replied that she needed to speak with her, but counsel never heard back. Investigators for the defense and prosecution also went together to the author's home, but no one answered the door after multiple knocks. Both investigators left their cards and requests for her to contact them, but the author did not contact either investigator.

The sitting juror appeared in court as requested. The trial judge asked the prosecutor and defense counsel to speak with him about the contents of the email. The prosecutor and defense counsel spoke with the juror for roughly forty-five minutes to an hour outside the presence of the trial judge. When given a copy of the email, the juror expressed confusion and denied having any animus against Simmons or encouraging other jurors to convict her based on race. He stated that the majority of the jurors were ready to convict Simmons of first-degree murder, but he slowed things down and eventually got the jury to agree to a verdict of second-degree murder.

The juror also stated that the author was his daughter-in-law, with whom he did not have a good relationship. He explained that his jury service had come up during a family function, but the juror had told his family that he could not talk about the case because it was then ongoing. The juror told counsel that he made no racial remarks during that time, and he was not sure how the author would have known that the defendant was African-American as he did not believe that he told his family members anything about the defendant. After finishing their conversation, both counsel gave the juror their information in case he had follow-up information. Later that afternoon, the juror called both counsel with information he had forgotten. The juror stated that his sister had been called as a potential juror in the same case but that she was dismissed due to a trip scheduled during trial. The juror indicated that the author may have

11

learned the defendant's race from his sister.  The juror also said that, during a custody battle over

his grandson, he wrote a letter in support of his son that attacked the author's character.  The

juror felt his role in the custody proceeding could be the reason for the author's allegations.

      The trial court subsequently held a status conference in which both attorneys appeared

and reported to the court their conversation with the sitting juror and their attempts to contact the

email's author.  After hearing the parties' observations from that conversation and learning that

neither had been able to get further information from the author to substantiate the juror bias

claim, the trial judge denied Simmons' motion for a new trial, stating:

> The fact of the matter is if [racial bias] had occurred in this court, it was such an
> affront so that any notion anyone might have of what is just and fair, it would be swiftly
> dealt with.  I am convinced and beyond satisfied that [defense counsel] and her defense
> investigator have done everything they can to uncover competent evidence in that regard.
> I have no competent evidence in front of me by way of affidavit, testimony or
> anything else that would suggest that . . . [the] allegation is true.  I have no basis to
> believe that it is because I have no competent evidence before me.  If any evidence
> existed, I have no doubt it would have been presented to me at this time.  There are no
> affidavits.  There are no declarations.  There are no witnesses to testify.

      The Court finds that the trial court's handling of the allegations of juror bias and

Simmons' motion for a new trial were reasonable and in accordance with clearly established

federal law.  The trial court's fact finding process was "objective and reasonably explored the

issues presented [and, therefore,] the state trial judge's findings based on that investigation are

entitled to a presumption of correctness."  *Hedlund*, 750 F.3d at 807.  It is unfortunate that the

trial judge was not able to question the sitting juror's family member who made the accusation of

bias or question the juror's impartiality directly so that the judge could observe the juror's

demeanor and assess the juror's credibility firsthand.  Nevertheless, because there was no

competent evidence to demonstrate that the juror was in fact biased, the trial judge was not

required to do so.  Simmons did not establish actual bias, that is "a state of mind that leads to an inference that the person [did] not act with entire impartiality."  *Olsen*, 704 F.3d at 1189. Because Simmons was given an opportunity to establish actual bias and the trial court's factual determinations were reasonable, the appellate court's decision to deny Simmons' claim was not contrary to, and did not involve an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of fact.  Importantly, there is no reason to expect that an attorney appointed today would have more luck than Simmons' trial counsel and investigator in persuading the author of the e-mail to discuss the matter.[1]  Simmons is therefore not entitled to relief on this ground.

Ground Two:                 Ineffective Assistance of Appellate Counsel

Simmons next argues that her appellate counsel was ineffective for failing to raise on appeal her claims that a juror was biased against her (Ground One) and the prosecutor committed misconduct (Ground Six).  Simmons raised this claim in her state habeas petition to the California Supreme Court, which was summarily denied.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

---

[1]        Some judges faced with this record might have subpoenaed the family member and brought her to court to testify under oath regarding her e-mail accusing the juror of bias. Simmons' attorney did not request a subpoena, however, no decision of the United States Supreme Court requires a trial judge to *sua sponte* issue such a subpoena, and failure to do so cannot be deemed "unreasonable."

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Simmons must show that her trial or appellate counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

As discussed with respect to Grounds One and Six in the instant Petition, however, those underlying claims are without merit.  Consequently, Simmons' appellate counsel cannot be ineffective for failing to raise them on appeal.  *See Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993) (O'Connor, J., concurring) (failing to raise a meritless objection cannot constitute prejudice under a *Strickland* ineffective assistance of counsel claim); *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) (appellate counsel does not have an obligation to raise every nonfrivolous argument); *Turner v. Calderson*, 281 F.3d 851, 872 (9th Cir. 2002) ("A failure to raise untenable issues on appeal does not fall below the *Strickland* standard.").  Simmons thus cannot prevail on this claim.

Ground Three:        <u>Trial Court Errors</u>

Simmons also claims that the trial court committed a number of reversible errors.

1.    *Juror Bias*

The juror bias claim raised in Ground Three alleges that same facts already addressed with respect to Ground One.  For the same reasons, Simmons cannot show that the trial court erred in denying her new trial motion after finding no evidence of juror bias.

2.    *Instructional Error*

Simmons additionally contends that the trial court made a number of instructional errors that warrant reversal of her conviction.  Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal

court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73.  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.*  Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete

instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process."  *See id.* at 156-57; *Estelle*, 502 U.S. at 72.  Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).[2]

### a.    Aiding and abetting

Simmons renews her argument made on direct appeal with respect to three aspects of the aiding and abetting instructions given during trial: 1) insufficient evidence of aiding and abetting assault for murder; 2) California's merger doctrine prevented a theory of aiding and abetting assault for murder; and 3) there was no target crime instruction.

Notably, Simmons herself, by telling stories to her son and friends, introduced scenarios that implicated the aiding and abetting theory.  After the close of evidence, the jurors were presented with several possible scenarios, including: 1) Simmons engaged in an act of prostitution with Jackson, became angry when he did not pay, struck him multiple times in the head and took his money, keys, car, and the weapon; 2) Simmons drank or did drugs with Jackson and then left on her own, upon which she saw two females enter Jackson's apartment;

---

[2]    The Supreme Court recently clarified that *Brecht* incorporates the requirements of § 2254(d) (AEDPA).  *See Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015).  Thus, if a state court has determined that a trial error was harmless, "a federal court may not award habeas relief under § 2254(d) unless *the harmlessness determination itself* was unreasonable."  *Id.* (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)) (emphasis in original).

and 3) Simmons went to Jackson's apartment for the purpose of helping drug dealers enter his apartment, who then killed Jackson and made her clean up the mess.  The trial court instructed the jury as to all three theories.

The Court of Appeal considered and adjudicated Simmons' claim that the court erroneously instructed the jury on the aiding and abetting theory as follows:

> [Simmons] asserts a number of errors with respect to the jury instructions the trial court provided describing the principle that a person who aids and abets a confederate in the commission of a crime is liable not only for that crime, but also for any other crime committed by the confederate that is a natural and probable consequence of the crime originally aided and abetted.  We find any instructional error to have been harmless.

## A. *Applicable Law*

> Under the "'natural and probable consequences' doctrine," a person who aids and abets a perpetrator in the commission of a crime is liable not only for that crime (the target crime), but also for any other crime (nontarget crime) committed by the perpetrator as a "natural and probable consequence" of the crime originally aided and abetted.  To convict a defendant of a nontarget crime as an accomplice under this doctrine, "the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the commission of the target crime.  The jury must also find that the defendant's confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a 'natural and probable consequence' of the target crime that the defendant assisted or encouraged."  (*Ibid.*)  The trial court has a sua sponte duty to instruct the jury on the natural and probable consequences doctrine "when the prosecution has elected to rely on the 'natural and probable consequences' theory of accomplice liability and the trial court has determined that the evidence will support instructions on that theory."  (*Id.* at p. 269.)

## B. *Additional Background*

> The jury was instructed with the standard CALCRIM instructions on aiding and abetting (CALCRIM Nos. 400 and 401), including the natural and probable consequences doctrine (CALCRIM No. 403).  While the prosecution did not argue an aiding and abetting theory to the jury, instead arguing that [Simmons] alone killed Jackson after he tried to postpone paying her, the prosecution nevertheless asked the trial court to provide these instructions because of [Simmons'] statements to Person that two drug dealers committed the murder after she "set up" Jackson by letting them into his apartment.

18

CALCRIM No. 400, as given to the jury, provided: "A person may be guilty of a crime in two ways: One, she may have directly committed the crime.  I will call that person the perpetrator; two, she may have aided and abetted a perpetrator who directly committed the crime.  [¶] A person is guilty of the crime, whether she committed it personally or aided and abetted the perpetrator who committed it.  Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

CALCRIM No. 401, as given to the jury, provided in relevant part: "To prove that the Defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] The perpetrator committed the crime.  [¶] The Defendant knew that the perpetrator intended to commit the crime.  [¶] Before or during the commission of the crime the Defendant intended to aid and abet the perpetrator in committing the crime.  [¶] And the Defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.  [¶] Someone aids and abets a crime if she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

CALCRIM No. 403, as given to the jury, provided: "Before you may decide whether the Defendant is guilty of murder, you must decide whether she's guilty of assault with a deadly weapon, felony assault.  To prove that the Defendant is guilty of murder, the People must prove: [¶]  That the Defendant is guilty of felony assault; during the commission [of] a felony assault a co-participant in that felony assault committed the crime of murder; and under all the circumstances, a reasonable person in the Defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the felony assault.  [¶] A co-participant in a crime is a perpetrator or anyone who aided and abetted the perpetrator.  It does not include a victim or innocent bystander.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  [¶] In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  If the murder was committed for a reason independent of the common plan to commit the felony assault, then the commission of murder was not a natural and probable consequence of felony assault.  [¶] To decide whether the crime of murder was committed, please refer to the separate instructions that I will give you on that crime."

During deliberations, the jury sent the trial court the following question: "What are the necessary criteria to be an accomplice to 2nd degree murder [?]"  The trial court responded by referring the jury back to CALCRIM Nos. 400, 401, and 403 on aiding and abetting, and to CALJIC Nos. 8.30 and 8.31 defining second degree murder.  The trial court also explained in a special instruction: "Under the instructions you have already been given, there are [two] theories under which a person can be guilty as [an] aider and abettor.  First, he or she can be guilty as an aider and abettor of a crime committed by another if he or she aided and abetted the commission of the crime with the intent or purpose of aiding and abetting that crime.  In addition to being guilty of the intended crime, if another crime is committed during the commission of the intended crime, a

person can be guilty of the other crime, if, under all of the circumstances, a reasonable person in the defendant's position would have know[n] that the commission of the other crime was a natural and probable consequence of the commission of the intended crime."

The same day the trial court provided this special instruction, the jury sent two additional questions: "(1) What is the general definition of being an accomplice to 2nd degree murder?  [¶]  (2) What are the requirements to qualify as an accomplice?"  In response to these questions, the trial court referred the jury back to CALCRIM No. 400 and provided two additional instructions, CALJIC Nos. 3.01 and 3.02.

CALJIC No. 3.01, as given to the jury, provided: "An accomplice is someone who aids and abets the commission of a crime when she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime.  [¶] A person who aids and abets the commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

CALJIC No. 3.02, as given to the jury, provided: "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted.  [¶] In order to find the defendant guilty of the crime of murder as charged, or of any lesser offense, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of felony assault was committed; [¶] 2. That the defendant aided and abetted that crime; [¶] 3. That a co-principal in that crime committed the crime of felony assault; and [¶] 4. The crime of murder was a natural and probable consequence of the commission of the crime of felony assault.  [¶] In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur.  The issue is to be decided in light of all of the circumstances surrounding the incident.  A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened.  'Probable' means likely to happen."

## C.  *Analysis*

### 1.  *Sufficiency of the Evidence*

[Simmons] claims the trial court should not have given CALCRIM No. 403 or CALJIC No. 3.02 because "there was no substantial evidence [she] intended to and did commit an [assault with a deadly weapon], the target offense, or that she aided and abetted the commission of an [assault with a deadly weapon] the [natural and probable consequence] of which was murder."  We disagree.

According to Person's statement to Detective Jasperson, [Simmons] told Person that a drug dealer promised to give her "some dope" in exchange for helping him "get in contact" with Jackson because he and Jackson "had something going on between each

20

other.  You know, some kind of problems."  [Simmons] agreed.  Pursuant to the arrangement, she met with Jackson and went over to his apartment.  When the drug dealer arrived with another man, [Simmons] opened the door and let them into the apartment. According to Person, defendant said the fact that the drug dealers needed to "go through her" to get in touch with Jackson should have tipped her off that this "wasn't a good situation."  [Simmons] then explained that the drug dealers killed Jackson in front of her and forced her to clean up the crime scene by holding a gun to her head.

If Person's statement was believed, the jury could have found that [Simmons] knew the drug dealers came to Jackson's apartment to assault him and intended to facilitate the commission of that crime by opening the door to let them into the apartment. Knowledge and intent are "rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise."  The jury could have reasonably inferred [Simmons'] knowledge and intent from the fact that she told Person the drug dealers had "some kind of problems" with Jackson and needed to use defendant to gain access to his apartment.  The jury could also have found that one or both of the drug dealers defendant let into Jackson's apartment not only assaulted but also murdered Jackson.  This is precisely what [Simmons] told Person. The jury could reasonably have concluded that such a murder is a natural and probable consequence of an assault by two drug dealers on an unsuspecting and partially nude 65–year–old man.

Nor is it important that there is no evidence [Simmons] specifically knew the drug dealers were armed with a deadly weapon when she let them into the apartment.  First, a "deadly weapon" is " 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' . . . Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such . . . .  Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury."  "Objects which are not inherently dangerous but which have been found to be a deadly weapon include 'a pillow . . .; an automobile . . .; a large rock . . .; a razor blade . . .; [and] a fingernail file.'  [Citation.] Even an apple may constitute a deadly weapon if it contains a foreign object which is likely to produce great bodily injury when the apple is eaten. [Citation.]"  The question in this case is not whether [Simmons] knew the drug dealers were armed with a deadly weapon when they entered the apartment, but whether she knew they intended to assault Jackson with some object—regardless of whether they brought the object with them or used an object they found in his apartment—in such a manner as to be likely to cause death or great bodily injury.  Based on the facts of this case, we conclude the jury could have inferred as much.

Even if we were to find that there was insufficient evidence to support assault with a deadly weapon as the target offense, there was enough evidence to support simple assault as the target offense.  We have no difficulty finding that the result would have been the same had the trial court substituted simple assault as the target offense.  While murder "is not the natural and probable consequence of trivial activities," setting up a 65–year–old man to be assaulted by drug dealers in his apartment is not a trivial activity.

A reasonable person in [Simmons'] position would have foreseen murder as a natural and probable consequence of such an assault. Any error in using assault with a deadly weapon as the target offense instead of simple assault was harmless.

Finally, [Simmons'] reliance on *People v. Singleton* (1987) 196 Cal.App.3d 488 (Singleton ) is misplaced. Singleton was convicted of possession of cocaine for sale and transportation of the substance. She was a passenger in a vehicle driven by Bedell, who was pulled over by police and arrested for driving under the influence. A search of the vehicle uncovered a loaded handgun, which Singleton claimed belonged to her. She was arrested and searched. A package of cocaine was found in her boot. (*Id.* at p. 491.) At trial, the jury was given aiding and abetting instructions. The prosecutor told the jury during closing argument that "the sole purpose for the aiding and abetting instruction was to support the inference that defendant, while she may not have intended to sell cocaine herself, could have intended to aid an unidentified seller of cocaine (whom he called 'Mr. X'), and therefore still have possessed the necessary intent to be guilty of possession for sale. The prosecutor made clear, however, that the instructions were not meant to suggest that the seller was Bedell, who, he opined, was the 'one person whom she was not aiding and abetting . . . .'" (*Id.* at p. 492.) The Court of Appeal held the prosecution's aiding and abetting theory was not supported by substantial evidence. Pointing out that "the evidence justified the giving of an aiding and abetting instruction based upon the theory that Bedell was the principal dealer of cocaine and that defendant aided and abetted him by hiding the contraband," the court explained: "We cannot accept the notion that a defendant's conviction can rest solely on a theory of aiding, promoting, encouraging, or instigating a principal created from the whole cloth of pure speculation. Indeed, we find it puzzling that the People should simultaneously admit that there was insufficient evidence to convict defendant on the basis that she was Bedell's accomplice, but maintain that there was sufficient proof that she aided a phantom figure about whom the jury had heard no evidence." (*Id.* at pp. 492–493.)

Here, it is entirely possible that the two drug dealers who purportedly killed Jackson in front of [Simmons] were created from the whole cloth of [Simmons'] imagination. But this is very different from *Singleton* . . ., where the prosecutor used an anonymous perpetrator created from his imagination to support an aiding and abetting theory of criminal liability. Substantial evidence, in the form of [Simmons'] own statements to Person, supported the People's theory that she aided and abetted an assault by two drug dealers on Jackson and that murder occurred as a natural and probable consequence of the assault.

## 2. *The Merger Doctrine*

[Simmons] also contends that CALCRIM No. 403, as given to the jury in this case, violated the merger doctrine described by our Supreme Court in *People v. Ireland* (1969) 70 Cal.2d 522 (Ireland ). Not so.

In *Ireland*, supra, 70 Cal.2d 522, our Supreme Court held that a felony-murder theory cannot be based on a felony that is an integral part of the homicide. To allow otherwise "would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious

22

assault—a category which includes the great majority of all homicides." (*Id.* at p. 539.) As we explained in *People v. Karapetyan* (2006) 140 Cal.App.4th 1172: "Because a homicide generally results from the commission of an assault, every felonious assault ending in death would be elevated to murder, relieving the burden of the prosecutor to prove malice in most cases. [Citation.] This would frustrate the Legislature's intent to punish certain felonious assaults resulting in death more harshly than other assaults that happened to result in death but were committed without malice aforethought. [Citation.]" (*Id.* at p. 1178.) However, as we also explained in *Karapetyan*, "the natural and probable consequences doctrine operates independently of the second degree felony-murder rule" and "is a theory of liability for murder that applies when the assault has the foreseeable result of death. For aider and abettor liability, it is the intention to further the acts of another that creates criminal liability and not the felony-murder rule. [Citation.]"

While [Simmons] acknowledges "the *Ireland* doctrine has been found to be inapplicable to aiding and abetting instructions," she nevertheless argues that CALCRIM No. 403, as given to the jury in this case, "required it to find that [defendant] directly perpetrated an [assault with a deadly weapon]." [Simmons] continues: "Assuming [she] personally committed an assault, it merged into the homicide. Therefore, it was error to instruct the jury that it first had to find [she] committed an [assault with a deadly weapon] before [it] could find her guilty of murder. The instruction relieved the jury of its obligation to find malice aforethought, and lightened the prosecution's burden of proof." [Simmons] misreads the instruction.

CALCRIM No. 403 does not require the jury to find that [Simmons] directly perpetrated an assault with a deadly weapon. Instead, the instruction informed the jury that the natural and probable consequences theory required the People to prove: "[t]hat the Defendant is guilty of felony assault; during the commission [of] a felony assault a co-participant in that felony assault committed the crime of murder; and under all the circumstances, a reasonable person in the [Simmons'] position would have known that the commission of the murder was a natural and probable consequence of the commission of the felony assault."

In order to determine whether there is a reasonable likelihood the jury misunderstood "guilty" to mean "directly perpetrated," as [Simmons] suggests, we must review the instructions as a whole. CALCRIM No. 400 informed the jury that [Simmons] could be "guilty" of a crime either by directly committing the crime or by aiding and abetting the perpetrator. Moreover, after the jury expressed confusion over the CALCRIM aiding and abetting instructions, the trial court provided CALJIC No. 3.01, which more clearly defined the elements of aider and abettor liability, and CALJIC No. 3.02, which more clearly defined the natural and probable consequences doctrine: "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted. [¶] In order to find the defendant guilty of the crime of murder as charged, or of any lesser offense, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of felony assault was committed; [¶] 2. That the defendant aided and abetted that crime; [¶] 3. That a co-principal in that crime committed the crime of felony assault; and [¶] 4. The crime of

23

murder was a natural and probable consequence of the commission of the crime of felony assault."

We find no reasonable likelihood the jury misunderstood these instructions to allow [Simmons] to be convicted of murder if they found that she directly perpetrated a felony assault that resulted in death. Instead, they required the jury to find that she aided and abetted such an assault, which was committed by a co-principal, and that the crime of murder was a natural and probable consequence of the assault. This is an accurate statement of the law. We find no error. Nor do we find any constitutional violation.

**3.** *Special Instruction*

[Simmons] further asserts that the trial court's special instruction "was erroneous because it did not define a target offense, leaving the jury free to speculate about other, undefined offenses, or nefarious conduct." Again, we must review the instructions as a whole rather than judge the trial court's special instruction in isolation. The instructions as a whole clearly identified assault with a deadly weapon as the target crime.

Finally, [Simmons] claims the trial court erred by refusing her request to include in the special instruction the rule that an aider and abettor is not necessarily guilty of the same crime as the actual perpetrator.

Penal Code section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or *if they desire to be informed on any point of law arising in the case*, they must require the officer to conduct them into court. Upon being brought into court, *the information required* must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (Italics added.) The trial court possesses broad discretion "to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citations.] In exercising that discretion, the trial court 'must at least consider how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given.' [Citation.]"

Here, the jury asked the trial court: "What are the necessary criteria to be an accomplice to 2nd degree murder[?]" As already mentioned, the trial court responded by referring the jury back to CALCRIM Nos. 400, 401, and 403 on aiding and abetting, and to CALJIC Nos. 8.30 and 8.31 defining second degree murder. The trial court also explained in a special instruction that a person "can be guilty as an aider and abettor of a crime committed by another if he or she aided and abetted the commission of the crime with the intent or purpose of aiding and abetting that crime. In addition to being guilty of the intended crime, if another crime is committed during the commission of the intended crime, a person can be guilty of the other crime, if, under all of the circumstances, a reasonable person in the defendant's position would have know[n] that the commission of the other crime was a natural and probable consequence of the commission of the intended crime." The trial court did not abuse its discretion in determining that this response would satisfy the jury's request for additional information.

Nor are we persuaded by [Simmons'] reliance on *People v. Nero* (2010) 181 Cal.App.4th 504, which held that where "the jury asks the specific question whether an

aider and abettor may be guilty of a lesser offense, the proper answer is 'yes,' she can be." (*Id.* at p. 518.)  Here, the jury did not ask whether defendant could be found guilty of an offense less than the direct perpetrators.  Moreover, unlike *People v. Woods* (1992) 8 Cal.App.4th 1570, also relied upon by [Simmons], the trial court did not improperly instruct the jury that [Simmons] could not be found guilty of second degree murder as an aider and abettor if the jury determined the direct perpetrators were guilty of first degree murder. Instead, CALJIC No. 3.02, which was given to the jury to clear up any lingering confusion about the natural and probable consequences doctrine, informed the jury that defendant could be found guilty of "murder as charged, *or of any lesser offense*" (italics added), if the jury found beyond a reasonable doubt: "1. The crime of felony assault was committed; [¶] 2. That the defendant aided and abetted that crime; [¶] 3. That a co-principal in that crime committed the crime of felony assault; and [¶] 4.  The crime of murder was a natural and probable consequence of the commission of the crime of felony assault."

Viewing the instructions as a whole, we find no reasonable likelihood the jury misunderstood the instructions to preclude [Simmons] from being found guilty of a lesser offense than the direct perpetrators.  Indeed, because the natural and probable consequences doctrine "requires separate factual determinations for (1) what crimes have been committed, and (2) what crimes are the reasonably foreseeable consequences of the offense originally contemplated, it is self-evident that the aider and abettor does not stand in the same position as the perpetrator.  While the perpetrator is liable for all of his or her criminal acts, the aider and abettor is liable vicariously only for those crimes committed by the perpetrator which were reasonably foreseeable under the circumstances."  We find no instructional error.

*Simmons*, 2012 WL 1715860, at *12-18 (citations omitted).

Here, Simmons again argues that there was insufficient evidence to support the giving of an aiding and abetting instruction.  Such claim is without merit.  Simmons does not contend that CALCRIM Nos. 3.01 and 3.02 as given were incorrect; rather, she asserts that there was insufficient evidence to warrant the instructions.  But as the California Court of Appeal reasonably found, there was sufficient evidence to warrant the instructions in light of Person's interview with Detective Jasperson, which supported the prosecution's theory that she aided and abetted an assault on Jackson by two drug dealers and that murder occurred as a natural and probable consequence of that assault.  Although Person claimed at trial that she had fabricated her earlier story to police, Person's videotaped interview was properly before the jury, who could

determine whether Person's recantation of her earlier statement was credible.  If the jury found Person's testimony not credible, it could certainly conclude that Person's interview provided sufficient evidence to support the prosecution's aiding and abetting theory.  Simmons' arguments to the contrary simply raise questions of state law, which are outside the purview of this Court.  *See Bradshaw*, 546 U.S. at 76.  Accordingly, the trial court did not err in finding that aiding and abetting instructions were warranted.

Likewise, Simmons' argument that the state court misapplied California's merger doctrine is not cognizable on federal habeas review either.  *See id.*

And with respect to Simmons' complaint that the trial court failed to identify in the special instruction the target crime for felony murder, the Court concurs in the analysis of the Court of Appeal.  The significance of the trial court's failure to identify the target offense for second degree murder must be evaluated in context.  *See Henderson*, 431 U.S. at 152.  As the Court of Appeal concluded, "The instructions as a whole clearly identified assault with a deadly weapon as the target crime."  *Simmons*, 2012 WL 1715860, at *17.

Further, Simmons' claim that the trial court committed constitutional error by failing to instruct the jury that it could find Simmons guilty of a lesser offense if the jury believed that she had a less culpable state of mind than the actual perpetrator does not warrant habeas relief.  In essence, Simmons complains that the trial court did not instruct the jury that it could convict her of a lesser offense.  But Simmons did not have a constitutional right to have the jury instructed on any lesser offense to the crime of which she was convicted.  "Under the law of [the Ninth Circuit], the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."  *Windham v. Merkle*, 163 F.3d 1092,

1106 (9th Cir. 1998); *see also Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).  Furthermore,

the United States Supreme Court has never held that a trial court's failure to instruct on a lesser

included offense in a non-capital case violates due process of law.  Rather, the Supreme Court

has held only that a defendant has a constitutional right to have the jury instructed on lesser

included offenses in capital cases.  *Beck v. Alabama*, 447 U.S. 625, 638 (1980).  In so holding,

the Supreme Court expressly declined to state whether that right extended to non-capital cases.

*Id.* at 638 n.14; *see also Gilmore v. Taylor*, 508 U.S. 333, 361-62 (1993) (Blackmun, J.,

dissenting ) (observing that *Beck* left open question of whether due process entitles criminal

defendants in non-capital cases to have jury instructed on lesser included offenses).  Therefore,

the state court decision cannot be said to be contrary to, or an unreasonable application of,

federal law as decided by the Supreme Court.  *See Carey*, 549 U.S. at 77 (where Supreme Court

precedent gives no clear answer to question presented, "it cannot be said that the state court

'unreasonab[ly] appli[ed] clearly established Federal law'").  Simmons is not entitled to relief on

any argument advanced with respect to the aiding and abetting instructions.

        b.     Voluntary intoxication

Simmons additionally argues that the trial court erred by instructing the jury with

CALCRIM No. 625, which informed the jury that it could consider evidence of her voluntary

intoxication only in deciding whether she: 1) acted with the intent to kill; 2) acted with

deliberation and premeditation; or 3) intended to permanently deprive Jackson of his property.

According to Simmons, "[t]his instruction was erroneous because it failed to inform jurors that:

(1) evidence of voluntary intoxication could be considered in determining whether [she] acted

with express or *implied* malice, and (2) it could consider evidence of voluntary intoxication in

determining whether [she] formed the specific intent necessary for aiding and abetting."  The

Court of Appeal rejected the claim, reasoning:

> Because there was no evidence that [Simmons] was intoxicated at the time of the
> murder, we presume the jury disregarded this instruction.  Informing the jury that such
> nonexistent evidence could also be considered in determining whether defendant acted
> with implied malice or formed the specific intent necessary for aiding and abetting would
> not have changed the result.

*Simmons*, 2012 WL 1715860, at *19.

A review of the record demonstrates that evidence that Simmons may have been

intoxicated at the time of the killing was limited, and there was no evidence that any asserted

intoxication affected Simmons' actual formation of specific intent or malice.  *See People v.*

*Horton*, 906 P.2d 478 (Cal. 1995) (voluntary intoxication instruction not warranted where

evidence showed only that defendant had freebased cocaine the day before the crimes, there was

no evidence that defendant was intoxicated at time of the crimes, and defendant's statements

following the crimes showed defendant was "fully aware of his actions").  The Court of Appeal

thus reasonably concluded that the trial court did not err in refusing to give a voluntary

intoxication instruction unsupported by the evidence.  *See Williams v. Yarborough*, 228 F. App'x

705 (9th Cir. 2007) (failure to give voluntary intoxication instruction did not violate petitioner's

right to present a defense where California Supreme Court held evidence insufficient to warrant

such an instruction); *Suon v. Carey*, No. CVF 036201, 2006 WL 768633, at *5 (E.D. Cal. Mar.

24, 2006), *adopted*, 2006 WL 2065320 (E.D. Cal. July 24, 2006) (failure to give voluntary

intoxication instruction did not merit habeas relief where evidence showed only that the

petitioner was drinking on the day of the incident but did not show he was intoxicated or that his

mental state was affected by his drinking).

Moreover, as the Court of Appeal concluded in the alternative, any error was harmless. In light of the minimal evidence of Simmons' intoxication at the time of the incident and the absence of evidence on the issue of whether any alleged intoxication affected Simmons' actual formation of specific intent, the failure to give a voluntary intoxication instruction could not have had a "substantial and injurious effect or influence" on the verdict.  *See Brecht*, 507 U.S. at 637.  Accordingly, Simmons cannot prevail on this instructional error claim either.

3.     *Refusal to Re-Open Closing Argument*

Simmons additionally contends that the trial court violated her constitutional rights when it denied her request to re-open closing argument after providing the jury with a supplemental instruction on aiding and abetting (given after the conclusion of closing argument and in response to a jury question).  Simmons argues that the supplemental instruction presented the jury with a new theory of liability and, because she did not have an opportunity to address it, she was denied her right to present a defense as to all charges.

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  While the denial of an opportunity to make a closing argument violates a criminal defendant's constitutional rights, *see Herring v. New York*, 422 U.S. 853, 862 (1975) (finding that state statute authorizing trial judge in non-jury criminal case to refuse to hear defense closing argument in its entirety violated the Sixth Amendment), a trial court retains broad discretion to limit closing arguments.  As the *Herring* Court explained:

> This is not to say that closing arguments in a criminal case must be uncontrolled or even unconstrained.  The presiding judge must be and is given great latitude in

controlling the duration and limiting the scope of closing summations.  He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant.  He may ensure that arguments do not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial.  In all these respects he must have broad discretion.

*Id.* at 862 (citations omitted); *see also United States v. Scheffer*, 523 U.S. 303, 308 (1998) (a

defendant's interest in presenting evidence may "bow to accommodate other legitimate interests

in the criminal trial process") (citations and quotations omitted).

      The Court of Appeal rejected this claim as follows:

      Here, the jury was instructed on aiding and abetting, including the natural and probable consequences doctrine, prior to closing arguments.  Defense counsel was given an opportunity to argue against this theory of liability in her closing argument to the jury.  However, because the prosecutor did not argue the aiding and abetting theory, neither did defense counsel.  It was not until the jury asked for clarification about accomplice liability that defense counsel asked to re-open closing argument to address the theory.  Thus, the supplemental instructions given to address the jury's questions did not introduce "a new theory to the case," but "merely clarifie[d] an existing theory."  Defense counsel's decision not to address the aiding and abetting theory in her closing argument was a tactical decision.  Counsel apparently decided she should not highlight a theory of liability upon which the prosecution chose not to rely in her argument.  We may not second-guess such reasonable tactical decisions on appeal.

*Simmons*, 2012 WL 1715860, at *19 (citation omitted).

      As an initial matter, to the extent Simmons renews here her argument on direct appeal

that the trial court abused its discretion under state law, such claim is not cognizable on federal

habeas review.[3]  Even if the trial court erroneously applied state law in following this course of

_____

    [3]      Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.  Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.  *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review.  The question under AEDPA is instead whether the determination of the Michigan Supreme

action, the decision of the California Court of Appeal rejecting this state law claim is binding on

this court and may not be challenged in this federal habeas corpus proceeding.  *Waddington v.*

*Sarausad*, 555 U.S. 179, 192 n.5 (2009) ("we have repeatedly held that 'it is not the province of

a federal habeas court to reexamine state-court determinations on state-law questions'"); *Rivera*

*v. Illinois*, 556 U.S. 148, 158 (2009) ("[A] mere error of state law . . . is not a denial of due

process") (quoting *Engle v. Isaac*, 456 U.S. 107, 121, n.21 (1982) and *Estelle*, 502 U.S. at 67,

72-73).

Moreover, the Court agrees with the Court of Appeal that the supplemental instructions

did not interject any new theory into Simmons' trial.  Defense counsel was fully aware that the

prosecution was proceeding on a theory of direct liability or, alternatively, aiding and abetting

liability, given the aiding and abetting jury instructions submitted to the jury (discussed more

thoroughly above with respect to Simmons' instructional error claims).  The addition of CALJIC

No. 3.02 clarified causation under the natural and probable consequences test for the purposes of

aiding and abetting liability, and such liability was already in issue by virtue of the jury

instructions given prior to closing argument (CALJIC Nos. 400, 401, and 403).  *Cf. United States*

*v. Fontenot*, 14 F.3d 1364, 1368 (9th Cir. 1994) ("a supplemental jury instruction which merely

clarifies an existing theory does not mandate additional arguments").

As previously discussed, after the close of evidence, the jurors were presented with

several possible scenarios based on stories Simmons told to her son and friends regarding the

death of the victim.  Defense counsel therefore had the opportunity to argue in closing that

---

Court that there was no abuse of discretion was 'an unreasonable application of . . . clearly
established Federal law.'" (quoting § 2254(d)(1))).

Simmons witnessed the killing but did not assist it other than to clean up afterwards. She elected to argue that she was not there during the killing, presumably because the prosecutor chose not to stress the aiding and abetting scenario. It was only after the jury's questions indicated that they believed Simmons was present during the killing that Simmons moved to reopen closing argument. Because CALJIC No. 3.02 did not interject any new theory of culpability or new factual issue, there was no reason to reopen closing argument. Accordingly, the trial court's refusal to do so did not deprive Simmons of her constitutional right to make a closing argument and instead fell within the trial court's discretion to place reasonable limits on arguments. *Herring*, 422 U.S. at 862.

      4.     *Admission of Evidence of Other Crimes*

Simmons also alleges that the court violated her right to a fair trial when it admitted evidence of threats she had made to a third party in an unrelated event. At trial, the prosecutor elicited over defense objection testimony from Tyree that he had earlier told Detective Jasperson that Simmons "made some threats" against a family friend named Joe. When Tyree would not testify as to the substance of his statement, the prosecution played his earlier statement to law enforcement for the jury. In the recorded statement, Tyree said that Simmons had told Joe that, if he did not return money Joe had stolen from her, she would "have him killed" and that this "aint't gonna be the first time" she had somebody killed. Tyree described this event to Jasperson after he asked why Tyree waited several months to report Simmons' confession. The earlier statement was admitted as a prior inconsistent statement both for impeachment purposes and for the truth of the matter asserted to prove that Simmons had a propensity for violence.

On direct appeal, the Court of Appeal laid out the state law governing the admission of such evidence:

> [California] Evidence Code section 1101, subdivision (a), provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Subdivision (b) of that section provides that a specific instance of a person's conduct is admissible "when relevant to prove some fact . . . other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) Subdivision (c) provides: "Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." (Evid. Code, § 1101, subd. (c).)

*Simmons*, 2012 WL 1715860, at *21.

The appellate court subsequently denied Simmons' claim:

> In general, Tyree's prior statement to Detective Jasperson was relevant to impeach his trial testimony in which he either recanted or claimed not to remember most of what he previously told the detective. The specific statement about [Simmons'] threat to have Joe killed bolstered the credibility of Tyree's statement to Jasperson because it provided Tyree with a legitimate reason to report [Simmons'] confession to police, i.e., he was concerned for the safety of his little sister and grandmother. Nor was the statement unduly prejudicial under Evidence Code section 352. Tyree's credibility was a key issue for the jury to resolve. The probative value of Tyree's prior inconsistent statement on the issue of his credibility outweighed any prejudice caused by its admission. We find no abuse of discretion.

*Id.*

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson*, 431 U.S. at 154; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). On direct appeal, the appellate court determined that, in line with the

33

California Evidence Code and state case law, the trial court properly allowed into evidence

Tyree's prior statement about Simmons' threat to Joe.  This Court is bound by the state court's

interpretation of California state law.  *Bradshaw*, 546 U.S. at 76.

       Moreover, the United State Supreme Court has left open the question of whether state

law would violate the Due Process Clause if it permitted the use of prior crimes evidence to

show propensity to commit a charged crime.  *Estelle*, 502 U.S. at 75 n.5 ("[W]e express no

opinion on whether a state law would violate the Due Process Clause if it permitted the use of

'prior crimes' evidence to show propensity to commit a charged crime."); *Mejia v. Garcia*, 534

F.3d 1036, 1046 (9th Cir. 2008).  As such, the Ninth Circuit has routinely found federal habeas

relief to be foreclosed by § 2254(d)(1) for claims challenging the admission of evidence of prior

bad acts or crimes.  *See, e.g., Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008); *Alberni*

*v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006).  Consequently, Simmons cannot prevail on this

claim.

       5.     *Erroneous Read-Back of Testimony*

       Simmons also asserts that her conviction should be reversed because the jury

inadvertently heard Bishop Hinkson's testimony, in which he stated that he believed Simmons

had sought him out in his capacity as a Mormon bishop in order to receive forgiveness and to

clear her conscience.  During the jury's deliberations, the court reporter mistakenly read back

testimony provided by Hinkson during a hearing under California Evidence Code § 402, the

purpose of which was to determine whether the clergy-penitent privilege precluded Hinkson

from testifying as to the content of Simmons' statement to him.  While the Court of Appeal

agreed that the jury should not have been allowed to consider extrinsic evidence such as the 402

testimony in reaching its verdict, it rejected Simmons' claim that the read-back error violated her

constitutional rights.  The appellate court reasoned that Simmons failed to establish prejudice for

the following reasons:

> First, the trial court instructed the jury to disregard the hearing testimony they
> inadvertently received.  We presume the jury followed this instruction.  Second, the
> hearing testimony was nearly identical to the testimony the jury heard at trial.  And
> while, as [Simmons] points out, Hinkson testified at the hearing that he had previously
> told Detective Jasperson that he believed [Simmons] came to his church seeking
> "forgiveness" and "to talk about something that was on [her] conscience," it is likely the
> jury had already inferred as much from the fact that [Simmons] went to a church and
> confessed her involvement in a murder to a clergyman.  Moreover, the jury was informed
> about [Simmons'] apparent remorse and desire for forgiveness through other sources at
> trial.  For example, when Tyree drove [Simmons] around in the police bait car,
> [Simmons] stated that she told Person about the murder because she "was feeling guilty
> about it that day."  Person confirmed this when she told Jasperson that she and
> [Simmons] discussed asking "God for forgiveness."  And Joseph also told Jasperson that
> [Simmons] "confessed" to her because she wanted to "get it off her chest."

*Simmons*, 2012 WL 1715860, at *20 (citation omitted).

A trial error does not entitle a petitioner to federal habeas relief unless it "'had [a]

substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht*, 507 U.S.

at 622 (quoting *Kotteakos v. United States*, 328 U.S. 750, 766 (1946)).  Thus, habeas relief is

only available if the state court's determination that the error was harmless beyond a reasonable

doubt was contrary to or an unreasonable application of *Chapman v. California*, 386 U.S. 18, 24

(1967), which governs harmlessness determination on direct review.  *Davis v. Ayala*, 135 S. Ct.

2187, 2199 (2015) (reversing Ninth Circuit and holding that when state court's harmlessness

determination "is reviewed under AEDPA, a federal court may not award habeas relief under

§ 2254 unless *the harmlessness determination itself* was unreasonable" (emphasis in original and

internal quotation marks omitted)).  A state court's decision is not unreasonable if "'fairminded

jurists could disagree' on [its] correctness."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v.*

*Alvarado*, 541 U.S. 652, 664 (2004)).  Simmons "therefore must show that the state court's decision to reject h[er] claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Ayala*, 135 S. Ct. at 2199 (citing *Harrington*, 562 U.S. at 103).

Simmons cannot meet that heavy burden.  The reasons listed by the Court of Appeal to explain why the error did not violate Simmons' constitutional rights are both reasonable and fully supported by the record.  For those reasons, Simmons cannot show that the read-back error "had [a] substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 622.  Simmons is thus not entitled to habeas relief on this claim either.

Ground Four:        <u>Speedy Trial Violation</u>

Simmons further contends that the 18-year delay in bringing charges prejudiced her ability to prepare a defense and deprived her of due process.  Simmons moved to dismiss the case before the trial court on these grounds, arguing that the delay prejudiced her case due to "the loss and destruction of physical evidence, the loss of witnesses, and the loss of some of the witnesses' ability to recall and remember events," as well as the subsequent death of four potential witnesses.  Although concluding that Simmons' claims were "either speculative or in some respects perhaps overstated," the trial court nonetheless found "some prejudice to require the People to justify the pre-accusation delay."  The trial court ultimately found the justification proffered by the People—that there was insufficient evidence to prosecute Simmons for the murder until Tyree spoke with law enforcement about the case in 2009—outweighed any

potential prejudice to Simmons, and denied the motion to dismiss without prejudice.[4]  On direct

appeal, the Court of Appeal agreed with the trial court's conclusion.

The Court of Appeal gave the following background to this claim:

[Simmons] accurately describes the relevant background in her motion to dismiss the case: "The investigation, at the time of discovery of the decedent, continued in the usual manner: [h]omicide detectives were assigned to the case; evidence was collected; [Jackson's] car was located and searched; photographs were taken; [Simmons'] home was searched; witnesses were interviewed.  None of the evidence collected or witnesses interviewed proved that [defendant] had killed [Jackson]."  Accordingly, "the determination was made that there was insufficient evidence to support any charges being filed against [Simmons] or anyone else."  Eighteen years later, there was a "'change'" which prompted the filing of charges: Tyree walked into the police station and informed police that his mother had confessed to committing the crime.  Subsequent investigation revealed that defendant had also confessed to other people.

[Simmons] argued in her motion to dismiss that, notwithstanding these changed circumstances, the delay in prosecution was not justified because law enforcement should have done a more thorough investigation at the time of the murder.  [Simmons] further argued the delay in bringing charges prejudiced her defense because of "the loss and destruction of physical evidence, the loss of witnesses, and the loss of some of the witnesses' ability to recall and remember events."  With respect to the loss of witnesses, [Simmons] asserted, "Millicent Slater, the neighbor, and the decedent's son Richard Jackson, Jr., with whom he had a volatile relationship, are both dead.  Furthermore, Blue and John Gaines, the culprits in this homicide, are likewise dead."  [Simmons] offered no evidence that these individuals were the murderers.

With respect to the loss of witness memories, [Simmons] argued: "Since so much time has passed, it is now impossible to test the observations of witnesses on the night in question or test the accuracy of what the police claim was said that night.  It is impossible to ask the questions that were not asked at the time of [Jackson's] death about things they may have seen or heard.  [¶] If asked, witnesses could have supplied evidence as to the comings and goings of other potential suspects, of suspicious things they saw or heard on the date in question, reports of any fights, yelling or struggles coming from the room and lists of disreputable people who frequented the area.  Such information would have been investigated to prove [Simmons] is not responsible for [Jackson's] death."

Finally, with respect to the loss of physical evidence, [Simmons] stated without explanation that her defense was "disadvantaged in the fingerprint evidence."  She also stated that her defense was disadvantaged because "there is evidence that [Jackson] had AIDS and now it is impossible to show that the two culprits were likewise infected as a

---

[4]      The trial court noted that she would be permitted to renew her motion to dismiss at the conclusion of evidence, but Simmons did not do so.

result of their confrontation with [Jackson]."  According to [Simmons], "[a]s a result of the delay, it is impossible for the defense to prove that [Jackson] was involved with other [people who] would have had a motive for killing him and [obtain] the physical evidence linking them to the crime."  She further argued that "it is too late at this point to re-trace the steps of the investigating officers and follow the leads they did not follow, even though there were many."

The trial court denied the motion to dismiss.  Stating that the foregoing claims of prejudice were "either speculative or in some respects perhaps overstated," the trial court found "some prejudice sufficient to require the People to justify the pre-accusation delay."  The trial court then found the justification offered by the People, i.e., that there was insufficient evidence to prosecute defendant for the murder until new evidence literally walked into the police station, to be "strong" and similar to the situation presented in *New*, *supra*, 163 Cal.App.4th 442[.]  The trial court concluded that [Simmons] would not be "denied a fair trial because of this delay" and denied the motion to dismiss without prejudice to her ability to renew the motion at the conclusion of the evidence.

During trial, [Simmons] asked the trial court to allow her to call certain police officers to testify to the content of out-of-court statements made by four people who were interviewed during the initial investigation.  These people were Slater, Terry Hobbs, Maryanne Berube, and Roxanne Henderson.  According to [Simmons], Slater, Hobbs, and Berube told police "about who they saw in and about [Jackson's] apartment the day—likely the day of his death."  [Simmons] also stated that Henderson told police that she "heard" that Jackson "had a date with a girl on the day he was killed" and that "[t]here were reportedly two males with this girl," but that she did not "know who she heard this from."  Acknowledging that these statements were "technically hearsay," defendant explained that because Slater was dead, and Hobbs, Berube, and Henderson had not been located, "the only way for that information to be before the jury is through the officers who took those reports from those witnesses."  [Simmons] argued that because the absence of these witnesses was caused by the delay in prosecution, due process required the trial court to provide "some leeway in getting that information before the jury."  [Simmons] also mentioned that Jackson's son and one of the crime scene investigators who processed certain latent prints in the case, CSI Hudson, were also dead.

The trial court sustained the People's objection to the proposed testimony, ruling that [Simmons'] right to due process did not require admission of the proffered hearsay.  The trial court also reminded [Simmons] that she would be permitted to renew her motion to dismiss the case because of the delay in bringing charges at the conclusion of the evidence.  [Simmons] did not do so.

*Simmons*, 2012 WL 1715860, at *6-7.

Although Simmons characterizes this claim as a violation of her right to a speedy trial,[5]

the Supreme Court held in 1971 that a defendant may assert a constitutional violation for pre-

indictment delay under the Due Process Clause, but not under the speedy trial guarantee of the

Sixth Amendment.  *United States v. Marion*, 404 U.S. 307, 325 (1971) (holding that the

defendant failed to establish a due process violation because "[n]o actual prejudice to the

conduct of the defense is alleged or proved, and there is no showing that the Government

intentionally delayed to gain some tactical advantage over appellees or to harass them").  The

Supreme Court has further stressed that, in considering such due process claim, the inquiry must

consider not only the prejudice to the accused, but also the reasons for the delay:

> In our view, investigative delay is fundamentally unlike delay undertaken by the
> Government solely "to gain tactical advantage over the accused," precisely because
> investigative delay is not so one-sided.  Rather than deviating from elementary standards
> of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments
> until he is completely satisfied that he should prosecute and will be able promptly to
> establish guilt beyond a reasonable doubt.  Penalizing prosecutors who defer action for
> these reasons would subordinate the goal of "orderly expedition" to that of "mere speed."
> This the Due Process Clause does not require.  We therefore hold that to prosecute a
> defendant following investigative delay does not deprive him of due process, even if his
> defense might have been somewhat prejudiced by the lapse of time.

*United States v. Lovasco*, 431 U.S. 783, 795 (1977).

The Court of Appeals for the Ninth Circuit likewise has held that a defendant must first

show "actual, non-speculative prejudice from the delay."  *United States v. Corona-Verbera*, 509

F.3d 1105, 1112 (9th Cir. 2007).  Showing actual prejudice is a "'heavy burden' that is rarely

---

[5]       The Sixth Amendment to the United States Constitution guarantees an accused
criminal the right to a speedy trial.  *Doggett v. United States*, 505 U.S. 647, 651 (1991)
(explaining that a court should assess four factors in determining whether the Sixth Amendment
right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay;
(3) whether the defendant asserted the right; and (4) whether the defendant suffered prejudice as
a result of the delay); *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

met."  *Id.* (quoting *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992)).  "Generalized

assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual

prejudice.  Consequently, [a defendant] must show both that lost testimony, witnesses, or

evidence meaningfully has impaired his ability to defend himself, and [t]he proof must

demonstrate by definite and non-speculative evidence how the loss of a witness or evidence is

prejudicial to [his] case."  *Id.* (internal quotation marks and citations omitted).  Once the

defendant shows actual prejudice, he must next show that this prejudice outweighs the reasons

for the delay, and the delay "offends those 'fundamental conceptions of justice which lie at the

base of our civil and political institutions.'"  *Id.* (quoting *United States v. Sherlock*, 962 F.2d

1349, 1353-54 (9th Cir. 1989)).

Here, the record reveals the trial court employed a full inquiry into Simmons' contentions

of prejudice in considering her motion to dismiss, and the Court of Appeal subsequently

examined in detail every basis upon which Simmons claimed prejudice.  The Court of Appeal

thoroughly described that review in its reasoned opinion rejecting Simmons' speedy trial claim:

> We also agree with the trial court's assessment that [Simmons'] claims of
> prejudice were either "speculative" or "overstated."  [Simmons] argues that Slater was a
> "very important witness" who "had information that could have been helpful to the
> defense, and would have been investigated by the defense, had this crime been timely
> prosecuted."  As mentioned, Slater was the apartment manager who accompanied Hayes
> to Jackson's apartment and called the police when Hayes discovered the body.  Earlier
> that day, Slater called the police and reported a "suspicious subject" hanging around her
> apartment, which was close to Jackson's apartment.  The jury was informed of this
> through the testimony of Detective Woods.  While [Simmons] claims that Woods did not
> "follow-up on this critical information," she does not support this assertion with any
> citation to the record.  Nor did she question Woods about whether he followed up on
> Slater's statement.  [Simmons] also claims prejudice from the fact that she was unable to
> question Slater about her observations at Jackson's apartment when Hayes discovered the
> body.  However, the record indicates that Slater was "almost legally blind."  We are not
> persuaded that Slater's testimony concerning what she witnessed at Jackson's apartment
> would have been helpful to the defense.

With respect to Jackson's son, [Simmons] asserts, "[t]he defense had information that [he] had a volatile relationship with his father, making him a potential suspect in Jackson's killing." The record does not reveal what this information was. Indeed, the only evidence in the record is to the contrary. Hayes testified that Jackson and his son "got along pretty good." Hayes also testified that when she arrived at Jackson's apartment complex to check on him, Slater told her that Jackson's son tried to see him the previous day, which was Father's Day. Because Jackson's car was not there, his son assumed he had not come home the night before, waited in front of the apartment for a period of time, and then left. Moreover, while Detective Woods testified that family members were questioned early in the investigation, there was no evidence that Jackson's son was ever considered a suspect. Nor were his fingerprints found in Jackson's apartment or vehicle.

With respect to Blue and John Gaines, [Simmons] states that they were "two drug-dealers believed to be responsible for this crime," but cites no evidence to support this assertion. While she argues that the delay in prosecution prevented her from exploring their "possible involvement" in the murder, that is simply not true. She was apparently able to uncover that these men died. An investigator could have interviewed people who knew these men, found out where they lived at the time Jackson was murdered, discovered where they did business, determined whether or not they had any connection to Jackson, and so forth. In the absence of any evidence that these men had a reason to kill Jackson, disliked him, or even knew who he was, we must conclude [Simmons'] assertion that they were the actual murderers is pure speculation.

[Simmons] complains that she was deprived of the ability to question Hobbs, Berube, Henderson, and three other people, Sheila Talbert, Marilyn Brown, and Stephanie Taylor. She did not identify any of these people in her motion before the trial court. An argument on appeal may not invoke facts different from those the trial court was asked to apply. In any event, [Simmons] does not demonstrate these people were either dead or unavailable at the time of trial. Nor does she demonstrate that their testimony would have been useful.

[Simmons] also complains that the death of CSI Hudson prevented her from impeaching "his collection of the evidence: how the prints were lifted, how they were processed, where they were taken from, and whether the print cards were accurate." Because [Simmons] did not mention the death of CSI Hudson in her motion before the trial court, she may not rely on his death to support her argument on appeal. In any event, [Simmons] could have called an expert to challenge the quality of CSI Hudson's work. Moreover, the prints found on the Brillo pad wrapper were not processed by CSI Hudson. These prints were processed by CSI Sue Conradi, who did testify, and who was cross-examined by defense counsel.

[Simmons] further asserts that the delay "naturally caused memories to fade" and enabled Hinkson to "change his story." With respect to the fading of memories, we agree. But this prejudiced both [Simmons] and the prosecution. With respect to Hinkson changing his story, we disagree. When Hinkson was interviewed by Detective Jasperson, he stated that the woman who came to his church told him that "she was involved in a homicide, but he could not recall specifically whether or not she said she actually

41

committed it."  At trial, Hinkson testified that after speaking to Jasperson he spent some time thinking about his previous conversation with the woman and remembered that she believed she was "responsible" for the man's death, and that she mentioned "the cause of death may have been a blunt force trauma."  [Simmons] argues: "Obviously, if Hinkson had been interviewed 18 years earlier, when his memory was fresh, his story would have been clear and defined for trial.  And given what he initially told Jasperson, he would not necessarily have been a helpful witness for the prosecution."

There are several problems with this argument.  First, Hinkson could not have been interviewed 18 years earlier because [Simmons] did not tell him about the crime until about eight years before his interview with Jasperson.  Second, Hinkson could not have been interviewed prior to 2009, when Tyree informed Jasperson that his mother had confessed to the crime and told him about her conversation with Hinkson.  Third, even if police had somehow found out about [Simmons'] conversation with Hinkson when it happened, and interviewed Hinkson immediately thereafter, there is no reason to believe that his testimony would have been any different.

Finally, [Simmons] claims to have been prejudiced by the loss of physical evidence.  Specifically, she faults Detective Woods for failing to collect or test any of the blood at the crime scene and for failing to use chemicals to verify his visual observation that there was no blood in the kitchen and bathroom sinks.  According to [Simmons], "[t]he defense believed that the true killers, Blue and Gaines, suffered from HIV/AIDS," and that "[t]esting on the blood could have corroborated the defense."  There is no evidence that Blue and John Gaines had HIV/AIDS.  Nor is there any evidence that Jackson had the virus.  Thus, the idea that testing the blood at the crime scene could have corroborated the theory that these purported drug dealers were infected with HIV during their assault on Jackson is pure speculation.

[Simmons] also complains that additional scientific testing could have been done on certain items of evidence collected at the crime scene.  But these items of evidence were available at the time of trial, and [Simmons] neither had the items tested nor presented any expert testimony that the passage of time prevented her from doing so.

*Simmons*, 2012 WL 1715860, at *10-12.

The Court of Appeal likewise held that the prosecutor's reasons for the delay were

legitimate and justified:

Here, the District Attorney determined there was insufficient evidence to prosecute [Simmons] for Jackson's murder in 1991.  While her fingerprints were discovered in Jackson's apartment and in his vehicle, [Simmons'] statements to police at the time of the initial investigation provided a plausible explanation for the presence of these prints, i.e., Jackson picked her up in his car and brought her back to his apartment to engage in an act of prostitution.  [Simmons] also stated that Jackson bought her some cocaine with the money he paid for the "trick" at 16th Avenue and Martin Luther King Boulevard, and that she drove the car because Jackson was "drunk," which provided a

plausible explanation for her prints being found on the driver's side of the vehicle and for the driver's seat being positioned so close to the steering wheel. [Simmons'] statements did not explain the presence of her prints on the Brillo pad wrapper. However, without additional evidence tying [Simmons] to the commission of the crime, e.g., the murder weapon or blood-stained clothing, we cannot second-guess the District Attorney's conclusion that the evidence was insufficient to prove her guilt beyond a reasonable doubt.

Everything changed in 2009 when Tyree told Detective Jasperson that his mother had confessed to the crime. Without question, [Simmons'] confession constituted new evidence of her guilt. This confession was then corroborated by [Simmons'] statements to Hinkson, Joseph, and to a lesser degree, Person. Armed with this new evidence, the District Attorney charged [Simmons] with Jackson's murder. We agree with the trial court that the People provided a strong justification for the delay.

*Id.* at *9-10.

On federal habeas review, this Court's task is not to make an independent, *de novo* determination as to whether the prejudice suffered by Simmons was outweighed by the justification for the delay. Rather, this Court is to determine whether the state court's conclusion that the delay was due to law enforcement's inability to charge Simmons until 2009, and that it outweighed the prejudice Simmons suffered, was objectively reasonable. *Williams*, 529 U.S. at 412-13. Based on a review of the thorough record developed by the trial court and described on direct appeal, this Court must conclude that it was. Simmons has not shown that the California courts' findings of fact were unreasonable, or that the factual and legal conclusions that: a) Simmons did not suffer substantial prejudice, b) the delay was justified, and c) the prejudice did not outweigh the reasons for the delay, contravened or unreasonably applied clearly established federal law. Accordingly, Simmons cannot show that the pre-indictment delay violated her due process rights, and she is not entitled to relief on this ground.

Ground Five:            <u>Cumulative Error</u>

Simmons additionally alleges that the cumulative effect of the alleged errors she

identifies in Grounds One through Four warrant reversal of her conviction.   Simmons raised this

claim in her state habeas petition to the California Supreme Court, which was summarily denied.

"While the combined effect of multiple errors may violate due process even when no

single error amounts to a constitutional violation or requires reversal, habeas relief is warranted

only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th

Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).   Such "infection"

occurs where the combined effect of the errors had a "substantial and injurious effect or

influence  in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted).   In other

words, where the combined effect of individually harmless errors renders a criminal defense "far

less persuasive than it might [otherwise] have been," the resulting conviction violates due

process. *See Chambers*, 401 U.S. at 294.   As discussed above, however, Simmons does not

allege any claims that amount to error, and thus she demonstrates no errors that can accumulate

to a level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir.

2002).   Accordingly, Simmons is not entitled to relief on her cumulative error claim.

Ground Six:            <u>Prosecutorial Misconduct</u>

Finally, Simmons claims that the prosecutor knowingly elicited false testimony from her

son, Anthony Tyree, and compensated him for his false testimony.   Simmons raised this claim in

her state habeas petition to the California Supreme Court, which was summarily denied.

The record indicates that, prior to trial, Tyree did not have a permanent residence.   The

prosecutor offered Tyree witness protection, which would provide Tyree living expenses in

exchange for his testimony at trial.  Tyree received in excess of $1,000 through this arrangement, but left the program prior to trial.  Although the prosecution offered him a chance to re-enter, Tyree refused.

After asserting his Fifth Amendment right to remain silent, Tyree testified at trial pursuant to a grant of immunity from the prosecution.  Nonetheless, Tyree maintained that he had fabricated the details of Simmons' confession that he gave to Detective Jasperson on January 23, 2009.  He claimed that he only went to the police with a fabricated story of murder to help Simmons receive medical help through incarceration.  According to his statements at trial, Tyree went to the police in January 2009 because he was concerned about the safety of his family members and feared that his mother might hurt herself after he witnessed his mother acting crazy, belligerent, and mean.  Tyree further testified that he refrained from earlier telling law enforcement that his accusations were false because he wanted to garner more money through the witness protection program.  Simmons brings two related claims with respect to these facts: 1) the prosecutor knowingly elicited false testimony from Tyree; and 2) the prosecutor impermissibly compensated Tyree to obtain the perjured testimony.

1.      *Perjured Testimony*

"[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted).  The essential elements of such successful claim are that (1) the testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured, and (3) the false testimony was material.  *Hayes v. Brown*,

399 F.3d 972, 984 (9th Cir. 2005) (en banc); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001). Thus, if Simmons successfully shows that the prosecutor knowingly elicited perjured testimony material to her case, habeas relief may be warranted.

Here, Simmons' false testimony claim is a little confusing, as Tyree's testimony at trial, in which he recanted his earlier statement to law enforcement alleging that Simmons confessed to the murder, was exculpatory to Simmons. And, although the prosecutor has a duty to refrain from knowingly presenting perjured testimony, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002), the record does not support Simmons' unsupported contention that the prosecution knowingly introduced the perjured testimony of Tyree or induced him to change his testimony to suit the prosecution. Indeed, Simmons has failed to show that Tyree perjured himself at trial, particularly given that she has consistently argued that Tyree's testimony recanting his earlier allegations was credible.

Rather, the prosecution introduced Tyree's prior accusations against his mother as prior inconsistent statements to discredit his trial testimony exonerating his mother and as substantive evidence that the prior accusations were true. It is these prior statements that Simmons contends were perjured. But Simmons' arguments and both versions of Tyree's statements were before the jury, who ultimately decided that Tyree's prior accusations were not false. Simmons thus fails to demonstrate prosecutorial misconduct under these circumstances.

2.    *Impermissible Compensation*

Simmons' related argument that the prosecution impermissibly compensated Tyree appears to  rely on a decision in which a panel majority of the Fifth Circuit, interpreting

*Williamson v. United States*, 311 F.2d 441 (5th Cir. 1962), found impermissible a contingent fee arrangement premised on the informant's ability to implicate a preselected individual and assist in obtaining a conviction.  *See United States v. Cervantes-Pacheco*, 800 F.2d 452, 457-60 (5th Cir. 1986).

As an initial matter, the record here indicates that Tyree did not receive monetary compensation of the type found impermissible in *Williamson* and *Cervantes-Pacheco*.  It was established that Tyree had received living expenses as part of the witness protection program, not that he had been paid for his testimony.  *See Williams v. Yarborough*, 228 F. App'x 705, 707 (9th Cir. 2007) (noting that witness protection program payments did not constitute payment for witness's testimony).  In any event, the Fifth Circuit, sitting *en banc*, reversed the panel majority and overruled *Williamson*, concluding that "the credibility of the compensated witness, like that of the witness promised a reduced sentence, is for a properly instructed jury to determine." *United States v. Cervantes-Pacheco*, 826 F.2d 310, 316 (5th Cir. 1987) (en banc).  The Ninth Circuit has agreed "that the government is not precluded from using informants before or during trial simply because an informant may have a motive to falsify testimony or entrap innocent persons."  *United States v. Cuellar*, 96 F.3d 1179, 1182 (9th Cir. 1996).  As the Supreme Court explained:

> it does not follow that his testimony was untrue, nor does it follow that his testimony was constitutionally inadmissible.  The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.  At the trial of this case, [the informant] was subjected to rigorous cross-examination, and the extent and nature of his dealings with federal and state authorities were insistently explored.  The trial judge instructed the jury, both specifically and generally, with regard to assessing [the informant's] credibility.  The Constitution does not require us to upset the jury's verdict.

*Hoffa v. United States*, 385 U.S. 293, 311-12 (1966) (footnotes omitted).

Notably, Simmons does not allege that the prosecution failed to disclose the arrangement that provided Tyree with living expenses, the non-disclosure of which could warrant habeas relief as a *Brady*[6] violation.  *See Quezada v. Scribner*, 611 F.3d 1165, 1166 (9th Cir. 2010) (remanding to district court to hold evidentiary hearing as to state petitioner's claim that the government withheld evidence of compensation paid to a prosecution witness in violation of *Brady*).  Nor can she: the record is clear that Tyree testified as to the payments that were made, and the defense was able to thoroughly cross-examine him as to that issue.  Accordingly, Simmons is not entitled to relief as to this contention either.

## V. CONCLUSION AND ORDER

Simmons is not entitled to relief on any ground raised in her Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

---

[6]     *Brady v. Maryland*, 373 U.S. 83 (1963).  The term "*Brady*" is a shorthand reference to the rules of mandatory discovery in criminal cases under federal law.  *Brady* and its progeny require the prosecution to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 8, 2015.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge

49